## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| *IN RE* SUBPOENA TO JEFFREY GOLDBERG | ) ) ) ) ) | MISC. CASE NO. 1:01-MC-00115-RWR |
| MOSHE SAPERSTEIN, *et al.*, | ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) ) | |
| THE PALESTINIAN AUTHORITY, *et al.*, | ) ) | |
| Defendants. | ) ) | |

### DEFENDANTS' OPPOSITION TO
### NON-PARTY JEFFREY GOLDBERG'S MOTION TO QUASH SUBPOENA AND
### RESPONSE TO JEFFREY GOLDBERG'S MOTION FOR A PROTECTIVE ORDER

Defendants The Palestine Liberation Organization ("PLO") and The Palestinian

Authority ("PA") (collectively, "Defendants"), by and through counsel, respectfully submit this

memorandum of law in opposition to the Motion to Quash Subpoena and in response to the

Motion for a Protective Order (DE 1) filed by Non-Party Jeffrey Goldberg regarding the

subpoena served by Defendants on Mr. Goldberg on February 2, 2010.  For the reasons set forth

below, Mr. Goldberg should be ordered to appear for a deposition prior to the close of fact

discovery in this matter on March 10, 2010.

### BACKGROUND

Plaintiff Moshe Saperstein has brought suit against Defendants in the Southern District of

Florida under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333(a), alleging that Defendants are

liable for injuries he suffered during an attack that took place on February 18, 2002 in the Gaza

Strip.  At the time of the attack, Plaintiff was an American citizen living in an Israeli settlement in the Gaza Strip.

Defendants subpoenaed Mr. Goldberg for deposition in this matter because Mr. Goldberg had conversations with the Plaintiff both prior to and after the attack at issue which will be admissible at trial to show that the Plaintiff is biased against Defendants, and which the jury in this matter may properly consider in evaluating the Plaintiff's credibility as a witness and his motive for bringing this lawsuit.  Mr. Goldberg published his conversations with the Plaintiff in both a 2004 article in the New Yorker Magazine entitled "Among the Settlers" and a 2006 book entitled "Prisoners:  A Muslim and a Jew Across the Middle East Divide."  *See* Goldberg Decl. Ex. A & B.  They are set forth in the body of this brief so that their context and content will be understood as the predicate for Defendants' examination of Mr. Goldberg.

The first conversation between Mr. Goldberg the Plaintiff occurred while Mr. Goldberg and the Plaintiff were colleagues at The Jerusalem Post newspaper in Israel.  Chapter 24 of Mr. Goldberg's book, named after a statement of the Plaintiff ("Stop Being Jewish"), contains the following account of Mr. Goldberg's conversation with the Plaintiff and the context in which it took place.

> The road that runs down the mountain spine of the West Bank is called by Jews "The Way of the Fathers," because it links Shechem, or Nablus, the place where Abraham first entered the Promised Land, to Hebron in the south, where he is said to be buried.  During the Intifada it was a deadly road, but settlers go with God, and so did I, in soft-skinned rental cars.  I was driving one day with a man named Moshe Dann, a former American whose former first name was Marty and who found God and Israel after undergoing a spiritual crisis brought on when the History Department of the City College of New York denied him tenure. We were leaving the most radical block of settlements, those gathered around Shechem, where his daughter and her husband lived in a trailer with guns and a dog.

It is customary to pick up Jewish hitchhikers on this road, and so outside the settlement of Kfar Tappuach we took on three young boys wearing kippot and sidelocks.  The youngest was no more than eight.  They were going home to Jerusalem after a visit with their sister.  I was astonished to see such young children traveling alone, and I asked them about their parents, and it was only a few minutes before I realized that they were the grandchildren of Meir Kahane, the racist Brooklyn rabbi.

"I knew your grandfather," I said.

The oldest boy said, "The Arabs killed him."

Kahane was shot to death in November 1990 in a hotel in New York by an Islamist.  The funeral in Jerusalem a few days later was a disgrace.  Thousands of his followers screamed, "Death to the Arabs!"  The procession fractured between those who wanted to bury Kahane and those who wanted to kill Arabs.  I was standing outside the Mifgash Ha'esh restaurant, across the street from *The Jerusalem Post,* when the procession surged past.  A gang of Kahanists broke off from the main body and tried to ram through the doors of the restaurant, screaming together, "Let the Arabs out!"  I followed the crowd down the road to the Center One shopping center.  "We'll find the Arabs!" someone cried.  Then the mob attacked a bus. "There's Arabs on it!"  "We're going to kill you!" someone screamed.  A passenger yelled from the window, "There aren't any Arabs here!"  The Kahanists saw an Arab running from another bus.  The gang caught the Arab and smashed his head with a rock.  He lay on the ground as Israeli soldiers rushed to protect him from the madness of their Jewish brothers.

Kahane would have been proud of his mourners, and he would have called the Jewish soldiers who beat them back kapos and quislings.  There was no space in my heart for such a man but when his grandsons asked me what I remembered of him, I answered, "He had very profound thoughts," which was true.

By the time I first met Kahane, at the University of Pennsylvania, I had long before grown disenchanted with his ideas.  But in a speech he gave to hundreds of students -- most of whom were properly liberal and predisposed to loathe him -- he laid out what he saw as the hypocrisy of Jewish life in America in an unapologetic, ribald, and revolutionary way, and we surrendered momentarily to his charisma.  "It's just idiocy to have a bar mitzvah when you can't understand a word that's being said and when you know that the whole thing is just a chance for your

1029451.4

parents to spend $20,000 on shrimp and show off for their friends," he said, to laughter.  And he excoriated us:  "You're all cowards, you know.  Unless you come and join in the fight for Israel's survival, you're all cowards.  If you make the pursuit of money the only purpose of your lives, then you're nothing."  And he yelled at us, too, for knowing nothing about Judaism and for knowing no Hebrew.  "You know more about Christianity than you do about your own religion!" he said, and we knew this was true.

But Kahane was incapable of lifting Jews up without tearing everyone else down.  He was the mirror image of an Islamic supremacist.  In that speech at Penn, he ended up calling Arabs dogs. Later on, when I asked him about his reflexive anti-Arabism, he called me a *shaygetz,* a dirty Christian.

*Not everyone at the Jerusalem Post was upset by the funeral riot. Moshe Saperstein, for one, was not.  Saperstein, the one-armed, one-eyed, cigar-chewing misanthrope from the Lower East Side who was the Post's right-wing television reviewer, loved Kahane, in fact.*

*I noted once to him that Kahane wanted to expel all the Arabs.*

*Moshe arched an eyebrow. "And the problem is?"*

*I couldn't totally blame Moshe for having unkind feelings about Arabs -- it was an Arab rocket that tore off his arm in the Yom Kippur War, but his hostility was unbearable.*

Goldberg Decl. Ex. B. at 294-96 (emphasis added).  *See also* Jeffrey Goldberg, Prisoners:  A Muslim and a Jew Across the Middle East Divide at 173 (attached as Exhibit 1 hereto) (referring to the Jerusalem Post's "television reviewer, an Orthodox misanthrope named Moshe Saperstein, [who] was a Kahane sympathizer").

The second conversation between Mr. Goldberg the Plaintiff occurred in 2003 when Mr. Goldberg interviewed the Plaintiff and the Plaintiff's wife, Rachael Saperstein (also a witness in the underlying case), in the Plaintiff's then-home and car in an Israeli settlement in the Gaza Strip.  This conversation was published both in the 2004 New Yorker article and Mr. Goldberg's

2006 book.  In the book the conversation and its context was described by Mr. Goldberg as

follows:

> I lost track of Moshe over the years, but I had heard a rumor that he had left Jerusalem and moved to Gaza, to the Gush Katif block of settlements opposite the Palestinian city of Khan Younis.  I looked him up, and we arranged to meet one day not long ago.
>
> Moshe picked me up at the junction that makes the border between southern Gaza and Israel.  The junction, called Kissufim, was an armored camp.  Three dozen tanks and bulldozers stood ready to pass through the gates into Gaza. The only civilians present were the settlers of Gush Katif, waiting for the all-clear to go home.
>
> The road from the border to the settlement was under Israeli control -- concrete pillboxes were planted intermittently along the way -- but Palestinians often fired on the settlers' cars.  In 2001, Moshe told me, he was ambushed near Kissufim; Palestinian gunfire tore off two fingers of his remaining hand.  He had the presence of mind to push down on the accelerator, and he struck a Palestinian gunman.  Moshe pointed to the spot that marked the attack.  "Here's where I tried to run over the peace-loving Muslim," he said.  Sometimes, he said, he was overcome by a feeling that "Ahmed is trying to kill me."  Moshe referred to Arabs generically as "Ahmed."
>
> Just before we reached the fortified entrance to the Gush Katif block, we passed the ramshackle Bedouin village of Muwassi.  "They like to live like pigs in shit," Moshe said.  I was loud in my objections, and he said, "I'm sorry, that's politically incorrect.  'They have a different cultural aesthetic.'  Is that what I'm supposed to say?"
>
> Moshe and his wife, Rachel, came to the settlement of Neveh Dekalim, the largest village in the block, to retire.  Their children were grown and lived elsewhere in Israel.  The couple's ranch house, which overlooked the sea, would not have seemed out of place in Boca Raton.  The settlement was made up dozens of whitewashed houses and sand dune playgrounds, and it was the frequent target of Palestinian attacks.  A fifty-foot-high wall of concrete slabs sits about five hundred yards from the Sapersteins' house, separating the Jews from the Arabs.  Rachel taught English in the girls' school on the settlement.  I asked the Sapersteins why they had chosen this outlying village in Gaza rather than one of the

1029451.4

urban settlements near Jerusalem.  "We like the weather," Moshe said.  "We never lived near the sea."

Then he became serious for a moment.  "I'm here because of a religious commandment, believe it or not, as irrational as that may seem to you."

Ariel Sharon had just publicly suggested that his government would soon empty Gaza of Jews.  Sharon had, late in life, a change of heart about Gaza.  He had come to see the settlement project as politically, militarily, and demographically disastrous.  So he had announced a plan to "disengage" from Gaza.

Moshe and Rachel saw a unilateral withdrawal from Gaza as theological heresy and political suicide.  They moved here from Jerusalem in 1997 as a protest against the Oslo peace process. "Oslo meant the abandonment of land that was meant for the Jews," Moshe said.  "Call me an extremist. I don't care."

What seemed to offend Moshe the most about the disengagement proposal was that Arabs might one day live in his house.  "I had this Ahmed in here once, doing repairs, and he said, 'Do you know why I'm doing such good work?  Because one day I'm going to live here.' And I told him, 'If I'm kicked out of here, I'm going to blow this place up before I let someone like you have it.'"

Moshe did say, however, that he would leave if he thought his departure could bring peace.  This drew a look from Rachel.

"I wouldn't," she said.

Moshe was skeptical about the scenario, however.  He considered the idea that peace will come to Israel only when it cedes territory to the Arabs to be a Diaspora psychosis.  "We've lived for so many years in exile, we've forgotten what it is to be a powerful and ruling people," he said.  "We have always depended on the kindness of strangers, wherever we were; the czar, or some Polish landowner. We had to kiss ass because we couldn't defend ourselves.  Now that we have the strength to defend ourselves, we don't know how. Most of this country has an exile mentality.  Most of the population here takes the attitude that the Jews are at fault.  But what have we done to provoke those poor Palestinians?"

"Do we have to kill ourselves? Is that Jewish?"  Rachel asked. "You have to teach them: No more.  You want to do evil, you're going to take the consequences.  This is what America did to

1029451.4

Germany.  You finish them.  Bomb the hell out of them.  Just bomb the hell out of them."

I asked Rachel about her youth, in Brooklyn.

"The blacks hit me, of course," she said.  "We were raised in a very Jewish area.  Then the blacks came in and the Jews ran.  The first blacks came in and the Jews flew out of there so fast.  Everybody went to Crown Heights.  I don't want to run away.  I always see Jews running and running."

Many of the American-born settlers I know had early encounters with anti-Semitic roughnecks and many of them see an explicit link between the Palestinians and the "*shvartses*" of their youth.  Jews were chased from Brooklyn, in other words, and they won't be chased again.  Maybe it was because I was beaten up by Irish boys who couldn't be mistaken for Palestinians, but I did not sympathize with Moshe's ghetto bluster.

"Goyim used their hands, Jews used their brains," he said, describing his version of a Diaspora mentality.  "That's nothing more than a justification for weakness."

Weren't they overdoing it, I asked.  I, too had been punished for the death of Christ, but it wasn't Arabs who dealt me the suffering.  Moshe gave me an indulgent smile.

"Do you really think we're going to give the Arabs Gaza and then they'll leave us alone?  Don't be such a *shtadlan*," he said, using the Yiddish word for "middleman," a reference to the intermediary appointed by Jewish communities to negotiate with the gentiles.  "Answer me. Do you?"

No, I said, I didn't think so, not anymore. But I also didn't think that a pullout would cause the death of Israel.  It would be better for the Jews to be out of Gaza than in Gaza.  These settlements weren't doing much for our morality, and our morality was something we used to prize.

"Oh, please," Moshe said.  "You think there's a connection between Arabs living in shit and my being here?  Let me tell you, there isn't."

This is probably true.  The Gaza Arabs did not thrive under Egyptian rule either, and their per capita income, even in the middle of the Intifada, was no worse than the per capita income in many

1029451.4

places around the Arab world.  But there was something else: death.
The presence of Jews here, on this sand spit, caused death -- the
deaths of Jews, settlers and soldiers, and the deaths of Palestinians,
some of whom didn't even deserve it, I said.  I suggested to Moshe
that he try to imagine himself in the place of a Palestinian.

"You're a Palestinian, you're here, you have your farm your
grandparents are from here, and --"

But Moshe interrupted me.  "*Stop being Jewish!*" he yelled.
"Stop being Jewish!  Only a Jew would say, 'Imagine yourself as a
Palestinian.'  Could you imagine a Palestinian imagining himself as
a Jew?

Goldberg Decl. Ex. B at 296-99.  The account in the Article is shorter, but contains substantially

similar material:

One day a few months ago, Moshe Saperstein, who lives in Neveh
Dekalim, the biggest Jewish settlement in Gaza, picked me up at
the junction that marks the border between Gaza and Israel. The
junction, called Kissufim, is an armored camp. Three dozen tanks
and bulldozers were lined up in order to pass through the gates.
The only civilians here are the settlers of the Gush Katif bloc, a
string of settlements-Neveh Dekalim among them-along the
beaches of southern Gaza, between the Palestinian city of Khan
Younis and the Mediterranean.

Saperstein was born on the Lower East Side of Manhattan, and
came to Israel thirty-six years ago with his wife, Rachel, who is
originally from Brooklyn. As a soldier in the 1973 Yom Kippur
War, he lost part of an arm and part of his vision in an Egyptian
rocket attack. He is a heavyset man who smokes bad cigars and has
perhaps the most profane mouth in Orthodox Judaism.

The road from the border to the settlement is under Israeli control-
concrete pillboxes are planted intermittently along the way-but
Palestinians regularly fire on the settlers' cars. Two years ago,
Saperstein was ambushed near Kissufim; Palestinian gunfire tore
off two fingers of his remaining hand. He had the presence of mind
to push down on the accelerator, and struck a Palestinian gunman.

As we drove, Saperstein pointed to the spot on the road where the
attack had taken place. "Here's where I tried to run over the peace-
loving Muslim," he said.  Sometimes, he told me, he gets the
feeling that "Ahmed is trying to kill me." Saperstein refers to
Arabs generically as "Ahmed."

1029451.4

Just before we reached the fortified entrance to the Gush Katif bloc, we passed the ramshackle Bedouin village of Muwassi. "They like to live like pigs in shit," Saperstein said. I disagreed, vehemently, and he said, "I'm sorry, that's politically incorrect. 'They have a different cultural aesthetic.' Is that what I'm supposed to say?"

The Sapersteins came to Neveh Dekalim to retire; their children are grown, and live elsewhere in Israel. The couple's ranch house, which overlooks the sea, would not look out of place in the Jewish neighborhoods of South Florida. The settlement is a community of dozens of whitewashed houses and sand-dune playgrounds, and it is the frequent target of Palestinian attacks. A fifty-foot wall of concrete slabs sits about five hundred yards from the Sapersteins' house, separating the Jews from the Arabs.

Over lunch, I asked Saperstein and Rachel, who teaches English in the settlement's girls' school, why they had chosen a remote and dangerous settlement in Gaza rather than one of the urban settlements near Jerusalem. "We like the weather," he said. "We never lived near the sea. And I'm here because of a religious commandment, believe it or not, as irrational as that may seem to you." The Sapersteins see a unilateral pullout from Gaza as theological heresy and political suicide. They moved here from Jerusalem in 1997, as a protest against the Oslo peace process. "Oslo meant the abandonment of land that was meant for the Jews," Saperstein said. "In this respect, I'm a fundamentalist… . Call me an extremist. I don't care."

I raised the question of whether Jewish parents who place their children within range of Palestinian rockets had their priorities in order. Exasperated, Rachel said, "If I believe in holy law, that the settlement of the land of Israel is a commandment of God, and I want my children to be raised as Jews, I have to take them where they're going to fulfill this mitzvah. I have to take my child and physically he has to settle the land with me. I can't say I won't do things because I don't want him to suffer."

Saperstein said, "If I believed that if all the settlers disappeared tomorrow then peace and happiness would reign forever, that we could live in peace as Jews in what's left of our homeland, then I would seriously consider picking up and going somewhere else."

Rachel looked at her husband.

"I wouldn't," she said.

1029451.4

Saperstein is skeptical about this scenario, however. He considers the idea that peace will come to Israel only when it cedes territory to the Arabs to be a Diaspora psychosis. "We've lived for so many years in exile, we've forgotten what it is to be a powerful and ruling people," he said. "We have always depended on the kindness of strangers, wherever we were. The tsar, or some Polish landowner. We had to kiss ass because we couldn't defend ourselves. Now that we have the strength to defend ourselves, we don't know how.

"Most of this country has an exile mentality," Saperstein went on. "Most of the population here takes the attitude that the Jews are at fault. But what have we done to provoke those poor Palestinians?"

"Do we have to kill ourselves? Is that Jewish?" Rachel said. "You have to teach them: 'No more. You want to do evil, you're going to take the consequences.' This is what America did to Germany. You finish them. Bomb the hell out of them. Just bomb the hell out of them."

I asked Rachel about her youth, in the Brownsville section of Brooklyn.

"The blacks hit me, of course," she said.

"She doesn't know the difference between being hit and being hit on," Moshe said.

"They also did that," Rachel said.

"We were raised in a very Jewish area," she said. "Then the blacks came in and the Jews ran. The first blacks came in and the Jews flew out of there so fast. Everybody went to Crown Heights. I don't want to run away. I always see Jews running and running."

American-born settlers often recollect encounters with anti-Semitic roughnecks, and many of them see an explicit link between the Palestinians and the *shvartses*, a word I heard several times in interviews: the Jews were chased from Brooklyn, and they won't be chased again.

Saperstein, too, has a story of street anti-Semitism. "I was about ten or eleven. I looked out of our window. Some yeshiva guy was walking and these two drunk Italians started pushing him, yelling at him, slapping him. He just covered himself up. One of my parents yelled out the window, 'Police! Police!' They went away. Then my mother said, 'I wonder what he did to provoke that.'

1029451.4

"It was at that point I knew I had to come to the Jewish country and be proud. 'Goyim used their hands. Jews used their brains'- well, that's nothing more than a justification for weakness."

I suggested that he try to imagine himself in the place of a Palestinian. "You're a Palestinian, you're here, you have your farm, your grandparents are from here, and-"

But Moshe interrupted me. "*Stop being Jewish!*" he yelled. "Stop being Jewish! Only a Jew would say, 'Imagine yourself as a Palestinian.' Could you imagine a Palestinian imagining himself as a Jew?"

Neveh Dekalim is one of the settlements that Ariel Sharon has promised to shut down. What seemed to offend Saperstein most was that Arabs might one day live in his house. "I had this Ahmed in here once, doing repairs, and he said, 'Do you know why I'm doing such good work? Because one day I'm going to live here.' And I told him, 'If I'm kicked out of here, I'm going to blow this place up before I let someone like you have it.' "

Goldberg Decl. Ex. A at 6-8.  Mr. Goldberg's Motion to Quash the subpoena seeking deposition testimony regarding these published accounts should be denied for the reasons that follow.

## ARGUMENT

## I.   MR. GOLDBERG'S TESTIMONY IS NOT PRIVILEGED

Mr. Goldberg's principally contends that the subpoena should be quashed under the so-called journalist's privilege.  As the proponent of the privilege, Mr. Goldberg "has the burden of demonstrating its applicability."  *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 119 n.4 (D.D.C. 2002).  The district court's determination of the application of this privilege is reviewable for abuse of discretion.  *Lee v. DOJ*, 413 F.3d 53, 59 (D.C. Cir. 2005).

Although Mr. Goldberg's brief cites a number of authorities which limit discovery of confidential information from journalists such as "outtakes," "confidential sources," "unpublished journalistic work product," "notebooks," "diaries," "unpublished interviews," "files" and the like, *see* Non-Party Jeffrey Goldberg's Motion to Quash Subpoena and/or for

1029451.4

Protective Order ("Mem.") at 4-7, Mr. Goldberg never makes the claim that the discovery sought

here involves the disclosure of confidential information, *id. passim*.  Indeed, he cannot as the

only discovery currently sought from Mr. Goldberg is his testimony that the Plaintiff and his

wife in fact made the statements Mr. Goldberg has published and attributed to them, and Mr.

Goldberg's published first hand observations of the circumstances under which the Plaintiff and

his wife made the statements at issue.  Accordingly, Mr. Goldberg's privilege claim must be

assessed in light of the fact that Defendants are seeking only nonconfidential information.  *See*

*Hutira*, 211 F. Supp. 2d at 119 n.5 ("the Court assumes, as it must, that the information is

nonconfidential since the burden of demonstrating the applicability of the privilege is on the

reporter").[1]

    "While the D.C. Circuit has explicitly held that confidential information obtained by

reporters during the newsgathering process is covered by the privilege, it has not yet ruled on

whether nonconfidential information is similarly protected."  *Id.* at 119-120 (citing *Zerilli v.*

*Smith*, 656 F.2d 705, 705 (D.C. Cir. 1981)).  While Mr. Goldberg cites some district court

decisions from this circuit, including *Hutira*, which apply the privilege to nonconfidential

material, Mem. at 6, it is worth noting that recent decisions by the D.C. Circuit have declined to

enforce the privilege even in contexts where confidential information is involved.  For example,

in the well-publicized litigation involving the disclosure of the identity of CIA officer Valerie

Plame, the reporters involved were ordered to reveal their confidential sources to the grand jury

notwithstanding their assertions of privilege.  In that case, the Court of Appeals expressly

affirmed that "a reporter called to testify before a grand jury regarding confidential information

---

[1] As Mr. Goldberg has noted, Defendants' subpoena did request some documents that might
conceivably been confidential, but Mr. Goldberg apparently has no such documents.  Mem. at 2
n.3.

1029451.4

enjoys no First Amendment protection." *In re Grand Jury Subpoena (Miller)*, 438 F.3d 1141,

1145 (D.C. Cir. 2005). One may reasonably ask how, in light of the Circuit Court's holding in

*Miller*, Mr. Goldberg could possibly enjoy a First Amendment privilege against being called to

testify at a deposition in a civil case regarding public information.

Another recent decision of the D.C. Circuit on the reporter's privilege went so far as to

question the justifications for the privilege for even *confidential* materials:

> In both the District Court and before us, Appellants rely on the theory that the First Amendment and federal common law create a privilege that protects the right of a journalist to conceal confidential sources of information in the face of otherwise legitimate compulsion of testimony in federal courts. Not only the breadth of this claimed privilege, but its very existence has long been the subject of substantial controversy. In *Branzburg v. Hayes*, 408 U.S. 665, 33 L. Ed. 2d 626, 92 S. Ct. 2646 (1972), the Supreme Court considered a claim of such a privilege in the context of reporters' refusal to reveal the identity of confidential sources in a grand jury investigation. Each of the reporters in *Branzburg* had been held in contempt for refusing to disclose the identity of informants or the nature of the information given him in confidence. The Supreme Court flatly rejected the existence of any such constitutional privilege, stating that "the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination." *Id.* at 689-90. The Supreme Court then expressly refused "to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy." *Id.* at 690.
>
> While some would read the absolute language of the Supreme Court as foreclosing the possibility of any such privilege under any circumstance, our court, among others, has limited the applicability of the *Branzburg* precedent to the circumstances considered by the court in *Branzburg* - that is, the context of a criminal proceeding, or even more specifically, a grand jury subpoena. In *Carey v. Hume*, 160 U.S. App. D.C. 365, 492 F.2d 631 (D.C. Cir. 1974), a libel case, we upheld a District Court order compelling a journalist "either on further deposition or in writing [to] identify the 'eyewitnesses' referred to by him . . ." in a publication underlying the proceeding. *Id.* at 639. However, we did so with at least the suggestion that some such privilege might survive *Branzburg* in

1029451.4

> the context of a civil action. Notably, we rejected the possibility
> "that there either is, or should be, an absolute First Amendment
> barrier to the compelled disclosure by a newsman of his
> confidential sources under any circumstances." *Id.* (emphasis
> added). A few years later, in *Zerilli*, we actually held that despite
> *Branzburg* there is a reporter's privilege in civil actions, and that
> "in the ordinary case the civil litigant's interest in disclosure
> should yield to the journalist's privilege." 656 F.2d at 712. But
> *Zerilli*, like *Carey*, made it plain that any such privilege is
> qualified, not absolute.

*Lee*, 413 F.3d at 57-58.  The reporters' petition seeking rehearing en banc of the *Lee* panel was denied over the dissents of Judges Rogers, Tatel and Garland.  *See Lee v. DOJ*, 428 F.3d 299 (D.C. Cir. 2005).  Thus, there is reason to seriously doubt whether the Court of Appeals would hold that there is a privilege against testimony regarding nonconfidential material such is at issue here.

The most recent Court of Appeals decision on the open issue at bar, *i.e.*, whether there is a journalist's privilege against testimony regarding nonconfidential material, appears to be the Seventh Circuit's decision in *McKevitt v. Pallasch*, 339 F.3d 530 (7th Cir. 2003).  That court began its analysis by noting that courts which have extended "the privilege to nonconfidential sources" based on concerns "with harassment, burden, using the press as an investigative arm of government, and so forth," "may be skating on thin ice" because "these considerations were rejected by *Branzburg* even in the context of a confidential source." *Id.* at 533.  Moreover, where, as here "the information in the reporter's possession does not come from a confidential source, it is difficult to see what possible bearing the First Amendment could have on the question of compelled disclosure." *Id.*  The Court therefore concluded that "rather than speaking of privilege, courts should simply make sure that a subpoena duces tecum directed to the media, like any other subpoena duces tecum, is reasonable in the circumstances, which is the general criterion for judicial review of subpoenas." *Id.*  That standard is obviously met here for the

1029451.4

reasons stated below.

Mr. Goldberg also argues in a footnote that the Court should recognize a common law privilege separate and apart from his claimed First Amendment privilege, but, as Mr. Goldberg also notes, no opinion of our Court of Appeals has recognized such a privilege.  Mem. at 11 n.7. Indeed, as one Circuit Judge has noted, the Supreme Court's decision in *Branzburg* appears to foreclose this very argument.  *See In re Grand Jury Subpoena (Miller)*, 438 F.3d at 1154 (Sentelle, J. concurring) ("the *Branzburg* Court repeatedly discussed the privilege question in common law terms as well as constitutional.  Indeed, the majority opinion by Justice White includes the phrase "common law" no fewer than eight times.  More significant than the fact that the Court frequently spoke of the common law is what the Court had to say about it: 'at common law, courts consistently refuse to recognize the existence of any privilege authorizing a newsman to refuse to reveal confidential information to a grand jury.'").  Moreover, even if such a privilege exists, it has been overcome for the reasons stated below.  Accordingly, the Motion to Quash should be denied.

## II.    EVEN IF THE PRIVILEGE EXISTS, IT DOES NOT BAR MR. GOLDBERG'S DEPOSITION

Alternatively, assuming *arguendo* that the asserted privilege applies in this Circuit to nonconfidential information, Mr. Goldberg has failed to demonstrate that it applies to all of the information at issue, and that it has not been overcome by Defendants' interest in obtaining the information sought.  Accordingly, the Motion to Quash should be denied.

### A.    The Privilege Does Not Apply to the First Conversation

As an initial matter, Mr. Goldberg has not met his burden of demonstrating that, with respect to each of the statements of the Plaintiff which were subsequently published, Mr. Goldberg "obtained the pertinent information for the purpose of disseminating it to the public,

1029451.4

and that he had this intent at the time he obtained the information." *Hutira*, 211 F. Supp. 2d at 119 n.4.  Indeed, it is apparent from Mr. Goldberg's eyewitness account of the riot that accompanied the funeral of Meir Kahane that the first set of statements pertaining to the Plaintiff's reaction to the riot were gathered not "for the purpose of disseminating [Plaintiff's statements] to the public," *id.*, but in the course of conversations between workplace colleagues, Goldberg Decl. Ex. B at 296.  Mr. Goldberg has similarly failed to demonstrate that the conversations he had with the Plaintiff which lead Mr. Goldberg to describe the Plaintiff as a "Kahane sympathizer," Exhibit 1 at 173, were "for the purpose of disseminating to the public," *Hutira*, 211 F. Supp. 2d at 119 n.4.  Accordingly, the asserted privilege has no application to the first set of conversations about which Defendants seeks to examine Mr. Goldberg.

### B.  Mr. Goldberg's Testimony is of Likely Relevance to a Significant Issue

Moreover, to the extent any qualified privilege applies, it has been overcome by Defendants' need for the testimony at issue.  "[W]here a civil litigant seeks nonconfidential materials from a nonparty press entity, the litigant is entitled to the requested discovery notwithstanding a valid assertion of the journalist's privilege if he can show that the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." *Id.* at 120 n. 6 (quoting *Gonzales v. NBC, Inc.*, 194 F.3d 29, 33 (2d Cir. 1999)).  Both of those tests are clearly met here.

Mr. Goldberg first argues that the subpoena should be quashed because he purportedly "has no information relevant to any party's claim or defense," Mem. at 5, because "the sum of Mr. Goldberg's knowledge of the attack is contained in the Article, *id.* at 8.  This argument is a straw man.  As Mr. Goldberg's counsel is well aware, Defendants do not wish to depose Mr. Goldberg to establish the facts surrounding the attack at issue, but to elicit evidence of bias in the form of statements made by the Plaintiff and his wife to Mr. Goldberg.  *Id.* at 10.  These

1029451.4

statements are "of likely relevance to a significant issue in the case," *Hutira*, 211 F. Supp. 2d at

120 n.6, because they demonstrate that these witnesses have a bias against "Arabs" generally,

and against Defendants in particular, which is relevant to both their credibility as witnesses and

the Plaintiff's motive for bringing this action.  *See United States v. Abel*, 469 U.S. 45, 52 (1984)

("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of

credibility, has historically been entitled to assess all evidence which might bear on the accuracy

and truth of a witness' testimony.").

    As the Court may be aware, Defendant PLO is the internationally recognized

representative of the Palestinian people, and is the counterparty to State of Israel in the Oslo

Accords which were entered as part of the Israeli-Palestinian peace process during the 1990s.

Defendant PA is the entity created by the Oslo Accords as a partially autonomous, transitional

government, with specified civil and security responsibilities for governing specified areas of the

occupied Palestinian territories captured by Israel in the 1967 war until such time as a final

agreement can be reached between the Israel and the PLO.  The statements made by the Plaintiff

and Mrs. Saperstein to Mr. Goldberg clearly demonstrate that the Plaintiff and his wife have a

bias against Palestinian Arabs generally, and that they oppose the peace process contained in the

Oslo Accords.  Goldberg Decl. Ex. A at 7-8, Ex. B at 296-99; Exhibit 1.  This is not a "fishing

expedition" as Mr. Goldberg claims, Mem. at 10:  rather is an effort to obtain in admissible form

statements evincing the bias of critical trial witnesses which are already in the public domain.

    These biases will clearly be relevant at trial to the Plaintiff's credibility.  As noted in Mr.

Goldberg's brief, Plaintiff does not contend that the Defendants committed the attack in which

he was injured.  Mem. at 3.  Rather, he contends that Defendants materially supported the so-

called Al Aqsa Martyr's Brigade, and that it was an Al Aqsa "cell" that attacked him.  *Id.  See*

*also* Oberlander Decl. Ex. D at 2-3, 14.  Accordingly, it will be important for the jury at trial to consider whether the Plaintiff has any biases which, consciously or not, might cause him to testify untruthfully or in an exaggerated manner about any aspect of the attack that he would argue supports his liability contentions.

The Plaintiff's wife has also been disclosed as a witness, and will presumably testify at trial about the nature of the injuries suffered by her husband in support of the Plaintiff's claim for damages.  The jury will likewise be entitled to hear evidence of her bias against the Defendants in order to properly assess the credibility of her testimony.

These biases are also clearly relevant to the Plaintiff's motive for suing these Defendants. Defendants are the counterparts to the Government of Israel in the on-going peace process which is designed to ultimately create a "two-state solution" with a Palestinian state governing what is now occupied Palestinian territory captured by Israel in the 1967 war.  Plaintiff's statements to Mr. Goldberg indicate that he opposes Israeli relinquishment of these territories, and even supports the removal of Arabs from these territories.  Goldberg Decl. Ex. A at 7-8, Ex. B at 296-299; Exhibit 1.  Any payment of damages by the PA to Plaintiff will hamper the PA's on-going efforts to govern the areas placed under its authority by the Oslo Accords, and will have a concomitantly negative impact on the peace process.  At trial the jury will be entitled to consider whether, in addition to his financial motive, the Plaintiff may have chosen to sue these Defendants in order to further his political biases against these Defendants.[2]

---

[2] For example, Defendant's have reason to believe that the Plaintiff has been working with an organization affiliated with certain plaintiffs in Anti-Terrorism Act cases brought against Defendants called Shurat HaDin—Israel Law Center, an organization whose motto is "Bankrupting Terrorism -- One Lawsuit at A Time."  *See* Shurat HaDin "About Us" Web Page, *available at*:   http://www.israellawcenter.org/About-Us.html (excerpt attached hereto as Exhibit 2).  The website also indicates that one of the defendants named in lawsuits associated with the

(footnote continued on next page)

1029451.4

Mr. Goldberg asserts that evidence of the Plaintiff's bias is "far from the kind of 'central' testimony going to 'the heart of the matter' required to overcome the reporter's privilege." Mem. at 10 (quoting *Zerilli*, 656 F.2d at 713). But Mr. Goldberg appeals to the wrong standard. The *Zerilli* standard applies to "confidential sources," 656 F.2d at 713, and has no application to the type of nonconfidential materials at issue here. This is the case because, "while nonconfidential press materials are protected by a qualified privilege, the showing needed to overcome the privilege is less demanding than the showing required where confidential materials are sought." *Hutira*, 211 F. Supp. 2d at 120 (quoting *Gonzales*, 194 F.3d at 36). *See also id.* ("the absence of confidentiality may be considered in the balance of competing interests as a factor that diminishes the journalist's, and the public's, interest in non-disclosure") (quoting *Shoen v. Shoen*, 5 F.3d 1289, 1295 (9th Cir. 1993)); *NLRB v. Mortensen*, 701 F. Supp. 244, 248 (D.D.C. 1988) ("a lesser showing of need and materiality is required for discovery of nonconfidential material than for the identity of confidential sources"). Here, all that is required to overcome any qualified privilege for these nonconfidential materials is that the statements at issue be "of likely relevance to a significant issue in the case." *Hutira*, 211 F. Supp. 2d at 120 n.6.

The First Circuit confronted an analogous set of facts in *United States v. La Rouche Campaign*, 841 F.2d 1176 (1st Cir. 1988). There the defendants in a criminal matter subpoenaed NBC seeking production of a video recording of an interview of Forrest Lee Fick, a former associate of the defendants who "was expected to be called as a government witness." *Id.* at 1177. Unlike this case, however, the material sought had not been previously disclosed to the

(footnote continued from previous page)
organization is "the Palestinian Authority." *Id.* The trial court has previously ruled that evidence of this type of bias is discoverable in this action. *See* Exhibit 3 hereto at 13.

1029451.4

public.  Rather, NBC had broadcast only about 1 minute of the approximately 100 minute

videotaped interview.  *Id.*  The district court nevertheless ordered the production of the interview

because it found "that it was likely that some statements made in the course of Fick's lengthy

interview would be inconsistent with his trial testimony and might also show bias."  *Id.*

On appeal the First Circuit affirmed.  The circuit court found that the district court had

not abused its discretion because, *inter alia,* "Fick was not only a scheduled prosecution witness

but it was uncontroverted that he would be a key witness, indeed one of the two most crucial

government witnesses," and "the outtakes would reveal inconsistent statements and bias; that is,

relevant evidence, admissible at trial."  *Id.* at 1179-80.  The Court of Appeals affirmed the

compelled disclosure of the interview even though the "material sought by the defendants is

intended for the sole purpose of impeaching Fick at trial," because "under the circumstances of

this case, where a putative key witness, whose general testimony is already known, is scheduled

to testify, we cannot hold it an abuse of discretion to compel the pretrial production of a

substantial interview of that witness.*"*  *Id.* at 1180.  The Circuit Court therefore held "that the

district court correctly determined that any First Amendment interest of NBC did not outweigh

the defendants' interests in the production of the subpoenaed material" because "the materials

sought concern a major witness" "and the material sought is an extensive interview likely to

offer the basis for impeachment."  *Id.* at 1182.

Similarly here, Defendants seek to compel Mr. Goldberg's testimony to obtain, in

admissible form, "substantial interview[s]" of the Plaintiff and his wife, who will be "key

witness[es]" in this matter in order to reveal the witnesses' "bias" which is "relevant evidence,

admissible at trial."  Indeed, here the case for disclosure is even stronger than *La Rouche* because

the impeaching statements have already been fully disclosed to the public in Mr. Goldberg's

Article and book.  Accordingly, because the biases of the Plaintiff and his wife are of likely relevance to significant issues in the case regarding both liability and damages, the Motion to Quash should be denied.

**C.      The Statements Made to Mr. Goldberg are Not Reasonably Available from Another Source**

Mr. Goldberg next argues that the subpoena for his deposition should be quashed because "any testimony concerning the 2002 attack or concerning Mr. Saperstein can be obtained more easily and appropriately from others, including Mr. Saperstein himself."  Mem. at 5.  *See also* Mem at 10-11.  Mr. Goldberg is incorrect.  Indeed the current record indicates that the statements Defendants wish to admit at trial can come only from Mr. Goldberg himself.

Mr. Goldberg's Declaration indicates that statements the Plaintiff made to Mr. Goldberg are "accurately reflected in the Article."  Goldberg Decl. ¶ 8.  Presumably Mr. Goldberg will similarly testify that the statements made to him by the Plaintiff (and his wife) are accurately memorialized in Mr. Goldberg's book.  As everyone appreciates, however, the Article and book are not themselves admissible at trial because they are hearsay.  *See Hutira*, 211 F. Supp. 2d at 123 ("there is no doubt that the newspaper article is hearsay and that it would ordinarily be inadmissible").  The fact that Mr. Goldberg has filed a Declaration testifying to the Article's accuracy will not make the Article admissible because his Declaration is also not admissible at trial.  *Id.* at 124 (noting that affidavits are "usually not admitted into evidence in ordinary trials").  It is, of course, for these very reasons that Defendants subpoenaed Mr. Goldberg to testify at a deposition, which will be admissible at trial under Federal Rule of Civil Procedure 32 and/or Federal Rule of Evidence 804 unless Mr. Goldberg should happen to be within the subpoena power of the trial court in Miami at the time of trial in October 2010.

1029451.4

Mr. Goldberg suggests that he should not have to be deposed because Defendants can obtain testimony regarding the Plaintiff's statements to Mr. Goldberg from the Plaintiff himself. However, it is apparent from the communications between Mr. Goldberg's counsel and counsel for the Plaintiff that the Plaintiff will not testify that the Plaintiff's statements are "accurately reflected in the Article."  To the contrary, Plaintiff clearly intends to deny that Mr. Goldberg accurately recorded the statements which Plaintiff made to Mr. Goldberg.  *See* Oberlander Decl. Exhibit C (email from Plaintiff's counsel stating that "if Mr. Goldberg gives testimony as requested by the PA and PLO we intend to examine him extensively about his anti-settler political bias and the impact is has had on the accuracy of his reporting (both in respect to the specific article at issue and in other articles penned by him), as well as the circumstances under which he lured Mr. Saperstein into giving an interview.").

Judge Parker confronted a similar situation in *NLRB v. Mortensen*, 701 F. Supp. 244, 249 (D.D.C. 1988) where he held that "the reporters' qualified privilege must yield to the NLRB's need to verify the statements."  In that case, a party issued subpoenas to newspaper reporters seeking deposition testimony verifying that witnesses had made certain statements to the reporters which the reporters had subsequently published.  *Id.* at 246.  The reporters resisted the subpoenas contending that sitting for such depositions would violate their qualified privilege.  *Id.* at 247.  The Court held the privilege had been overcome because the witnesses at issue had either denied or failed to confirm the accuracy of the statements which had been reported.  *Id.* at 249. This was the case because "where the journalist appears to be the only one with access to information relevant to the case, courts are willing to compel disclosure."  *Id.* at 248.  As Judge Parker noted,

> Journalists are often the only ones able to testify that certain statements were ever made, and the speaker's motivation in

> disclosing certain information to a reporter may be very important
> to a case. Courts have recognized that in some cases, a journalist's
> recollection of remarks within the context of the conversation is
> valuable information that the movant could not acquire from any
> other source. When movants clearly have no other source from
> which they can gain this insight, the journalist may be compelled
> to testify.

*Id.* (internal citation omitted). Similarly here, because only Mr. Goldberg is prepared to testify to

the accuracy of the statements made to him by the Plaintiff, Defendants must, of necessity,

obtain that testimony from Mr. Goldberg. For this reason Mr. Goldberg's "rather attenuated"

"interests in refusing to testify for the sole purpose of verifying the statements . . . must yield to

the need for confirmation as presented here," *id.* at 250, and the Motion to Quash should be

denied.

## III.   MR. GOLDBERG WILL NOT BE UNDULY BURDENED BY GIVING A DEPOSITION

Mr. Goldberg's brief also asserts that the subpoena should be quashed because as "a non-

party to this action," whose "sole connection to the matter at issue is that of a reporter who

conducted a single interview of plaintiff many years ago, the burden of the deposition would far

outweigh its likely benefit." Mem. at 5. Mr. Goldberg does not otherwise attempt to develop

these arguments, and they provide no justification for quashing the subpoena at issue for the

following reasons.

First, as the Court is well aware, subpoenas are a discovery tool which parties may utilize

to compel discovery from non-parties. Thus, the fact that Mr. Goldberg, like almost all subpoena

recipients, is a "non-party," does not by itself provide any basis for quashing the subpoena.

Second, as demonstrated above in Part I, Mr. Goldberg is connected to "the matter at

issue" by more than "a single interview of plaintiff," because the first set of conversations about

which Defendants wish to examine him occurred, not in the context of a newsgathering

1029451.4

interview, but in the course of conversations between workplace colleagues about a factual event, *i.e.* the riot associated with the funeral of Meir Kahane, to which Mr. Goldberg was an eyewitness.

Third, the deposition will not work any undue burden on Mr. Goldberg.  Defendants direct examination should not take a substantial amount of time, and, so far as Defendants are concerned, the deposition can take place in the city of Washington where Mr. Goldberg lives and works at a date convenient to him, so long as it take place prior to the close of discovery in this matter on March 10.  Indeed, Defendants have previously offered to reschedule the deposition to take place at a time convenient for Mr. Goldberg and his counsel so long as it occurs before the close of discovery.  Accordingly, no undue burden will be imposed on Mr. Goldberg by enforcement of the subpoena.

## IV.    DEFENDANTS DO NOT OBJECT TO A PROTECTIVE ORDER LIMITING INQUIRIES TO THE MATERIAL MR. GOLDBERG HAS MADE PUBLIC

Finally, Mr. Goldberg alternatively moves for a protective order limiting the subjects on which he may be deposed.  Mem. at 11-12.  Mr. Goldberg does not appear to have submitted a proposed order regarding his alternative motion, and the scope of the proposed protective order is not entirely clear from Mr. Goldberg's brief.  For example, the argument heading proposes an order "limiting the scope of any depositions to testimony confirming the accuracy of published information," but the text of the brief requests a much narrower order "limiting the scope of any examination to testimony regarding the account in the Article of the 2002 attack on Mr. Saperstein."  Mem. at 11, 12.  The latter proposal, Mr. Goldberg suggests, would prohibit questions "concerning his body of journalistic work beyond the information about the attack described in the Article--including other aspects of the Article not relating directly to the attack." *Id.* at 12.

- 24 -

As set forth above, Defendants are entitled to examine Mr. Goldberg about the accuracy of the all the relevant statements he has published.  This includes the published statements of the Plaintiff and Mrs. Saperstein, the published context in which those statements occurred, and Mr. Goldberg's published eyewitness descriptions of the circumstances under which the statements were made.  Defendants do not presently intend to inquire of Mr. Goldberg at his deposition beyond the content and context of his Article and book quoted above and the matters contained in his Declaration, *e.g.*, his professional background, and, would not object to a protective order limiting their examination accordingly.

For the reasons stated above, however, the Court should obviously not enter a protective order limiting inquiry to the straw man advanced by Mr. Goldberg, *i.e.* "testimony regarding the account in the Article of the 2002 attack," as that is not the information for which Defendants have subpoenaed Mr. Goldberg's testimony.

## **CONCLUSION**

For the foregoing reasons, Non-Party Jeffrey Goldberg's Motion to Quash Subpoena and/or for a Protective Order should be denied, and Mr. Goldberg should be ordered to appear prior to the close of fact discovery in this matter on March 10, 2010 under an appropriate protective order for a deposition to testify about relevant materials that Mr. Goldberg has published or otherwise publicly disclosed.

Dated:  February 18, 2010                Respectfully submitted,

By:  /s/ Richard A. Hibey
Richard A. Hibey
rhibey@milchev.com
Mark J. Rochon
mrochon@milchev.com
Charles F. B. McAleer, Jr.

1029451.4

cmcaleer@milchev.com
Timothy P. O'Toole
totoole@milchev.com
Brian A. Hill
bhill@milchev.com
**Miller & Chevalier Chartered**
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Telephone:  (202) 626-5800
Facsimile:  (202) 626-5801

Gary A. Woodfield (Fla. Bar No. 563102)
**Edwards Angell Palmer & Dodge LLP**
gwoodfield@eapdlaw.com
One North Clematis Street
Suite 400
West Palm Beach, FL 33401
Telephone: (561) 833-7700
Facsimile: (561) 655-8719

**Attorneys for Defendants PA/PLO**

1029451.4

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 18th day of February, 2010, a true and correct copy of

the foregoing was served by ECF, with a copy additionally being provided by hand delivery to

the following:

>Lee Levine
>Elizabeth C. Koch
>LEVINE SULLIVAN KOCH & SCHULTZ, L.L.P.
>1050 Seventeenth Street, N.W., Suite 800
>Washington, DC 20036
>Telephone:     (202) 508-1100
>Email: llevine@lskslaw.com
>Email  ekoch@lskslaw.com

and by email and first class mail to the following:

>Robert J. Tolchin
>THE BERKMAN LAW OFFICE, LLC
>111 Livingston Street, Suite 1928
>Brooklyn, NY 11201
>Telephone:     (718) 855-3627
>Facsimile:     (718) 855-4696
>Email:         rtolchin@berkmanlaw.com

>Isaac M. Jaroslawicz
>JAROSLAWICZ LAW OFFICES
>1177 Kane Concourse, #222
>Bay Harbor Islands, FL 33154
>Telephone:     (305) 398-7739
>Facsimile:     (786) 206-3575
>Email:         Isaac@MyLawyerIsaac.com

>**Attorneys for Plaintiff Moshe Saperstein**


>  /s/ Richard A. Hibey
>Richard A. Hibey

1029451.4